32 C.C.P.A.(Patents)

### Application of ROTHEMICH.

### Patent Appeal No. 4938.

Court of Customs and Patent Appeals.

Dec. 11, 1944.

A. Ponack, of Washington, D. C., for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting the claims (Nos. 14 and 15) in appellant's application for patent for an alleged invention relating to "pigment-resin dispersions in the form

of dry powders" to be used in organic film-forming compositions for modifying the shade of such compositions.

Claim 14 is sufficiently illustrative of the appealed claims. It reads:

"14. A dry powder for pigmenting organic coating and decorating compositions containing hydrocarbon solvents, and dispersible in such compositions rapidly and substantially completely on simple agitation comprising a dispersion of pigment in a resin soluble in toluene and having a melting point of at least 200° F., the particles being of such a size that substantially all of the powder passes a 20-mesh screen, the resin being present in sufficient quantity to at least satisfy the oil absorption of the pigment at room temperatures."

Claim 15 is similar to claim 14 except that it calls for the resin being "at least in 15% excess above that required to form a plastic with the pigment on a two roll mill operated at 140° F."

The reference is: Verbyla, 2,000,003, April 30, 1935.

As will be observed from quoted claim 14, appellant's powder comprises a dispersion of pigment in a resin soluble in toluene. Each of the claims calls for a powder of such size that substantially all of it will pass through a 20-mesh screen; a resin having a melting point of at least 200° F.; an amount of resin admixed with the pigment sufficient in quantity to satisfy the oil absorption of the pigment at room temperatures; and, in addition, claim 15, as hereinbefore noted, calls for an amount of resin "at least in 15% excess above that required to form a plastic with the pigment on a two roll mill operated at 140° F."

The patent to Verbyla relates to the preparation of pigments, and discloses a method of preparing a composition comprising finely divided pigments combined with thermoplastic resinous material of a type, as stated by the patentee, "suitable for use in a film-forming compound, such for example as a paint, enamel, lacquer or varnish, and which can be easily [and 'readily' as stated in claim 7] dissolved in a solvent such as may be used in such a compound." The patentee states that the pigments are "thoroughly disseminated in minute particles through the resin to form an apparently homogeneous mass"; that the pigment is incorporated in the resin by a "severe mixing, kneading, shearing and grinding action which breaks up the lumps or aggregates of the pigment and coats the resulting fine particles with the resin but causes the whole to coalesce into an apparently homogeneous mass," which, when cool, may be broken up into "quite small pieces"; and that it is not necessary to reduce the composition "to an impalpable powder." After giving four examples by way of illustration, example 1 of which will be hereinafter referred to, the patentee states:

"* * * that when the resin was dissolved in a vehicle of the type adapted for use in film-forming compositions, the pigment was disseminated in a remarkably smooth manner showing a better quality of product than that produced by the usual grinding. This definitely indicates that the average particle size of the pigment has been reduced to a size adapted for use in film-forming compositions, whereas a simple mixture of the pigment with a vehicle would give no such result as is well known in the art.

"The proportions of pigment to resin can of course be varied to a very substantial extent, depending upon the nature of the pigment and resin selected and upon the manner in which the product is to be used. Ordinarily it will be advisable to use approximately the maximum amount of pigment that can be coated and held together by the resin employed and this can readily be ascertained by experiment. However, a somewhat lesser amount of pigment may be used if the presence of a relatively large amount of resin will have no harmful effect on the final compound."

The patentee further states that the resins employed may be any of the "various resinous materials now employed in film-forming materials, such for example as the synthetic phenolic resins or resins of the glycerol-phthalic-anhydride-fatty acid type, as well as others"; that "natural resins such as rosin may be employed or modified natural resins such as the ester gums. It is understood that these types of resins are not intended to be exclusive, but are named merely to indicate that *all types of resins that are adapted to be used in film-forming compounds* and which can be softened by heat may be employed for my process." (Italics ours.)

In his statement to the Board of Appeals, the Primary Examiner stated that example 1 of the patent discloses "a ratio of pigment to resin" which meets "the limitations in the claims as to the resin content."

In example 1, the patentee shows an excess of resin to pigment which is conceded by counsel for appellant to be within the ratio called for by the appealed claims. Counsel contends, however, that that disclosure was accidental and that the patentee does not teach the resin-pigment ratio as defined by the appealed claims.

Example 1 was given as an illustration of the patentee's invention and, although the patentee does not use the exact language of the claims here on appeal, he clearly discloses the resin-pigment ratio called for by the appealed claims. Accordingly, no further comment need be made with regard to that issue.

Example 3 of the patent discloses the use of ester gum as a resinous material in the production of a coated pigment.

The Primary Examiner held that ester gum would inherently have the properties of the resins called for by the appealed claims, and that the selection of an ester gum or other resin having a melting point of at least 200° F. was a matter of choice and did not involve invention. The examiner stated that, although the patentee did not specify that the size of his resin coated pigment particles was such as would pass through a 20-mesh screen, his particles "would inherently have this size," and that if there was any difference in size between the patentee's resin coated pigment particles and those called for by the appealed claims, such difference would be only a matter of degrees and would not involve invention.

The Board of Appeals concurred in the views expressed by the Primary Examiner, and, in addition, stated that appellant had done nothing more than discover the particular conditions under which the disclosure in the reference patent could be operated with maximum success and that such discovery did not amount to invention. Although the board agreed that the Verbyla patent relates to the making of paint, varnish, etc., whereas appellant's product is used to "shade" paint and other organic coating and decorating compositions to secure exact duplication of color, it stated that "No reason is seen" why the composition disclosed in the reference patent "could not be used in the same way" and for the same purpose as appellant's composition, and that the most appellant had done was to make "a judicious selection of resins best suited for his purpose."

It appears from the affidavits of one William A. Weidlich, a chemist engaged in development work in the dispersion of pigments, that an important requirement for "all shading colors is that they disperse readily and rapidly"; that the time required for such dispersion should not exceed two or three minutes; that the affiant followed the disclosure in examples 2 and 3 of the reference patent and the results obtained were such that he concluded that none of the products disclosed by the patentee could be used for the purpose for which appellant's product was intended; that in one of his experiments he used a rosin-glycerol ester having a melting point of about 185–190° F., and the resin coated pigment particles sintered markedly, that is, the composition became a solid mass by heating without thoroughly melting; that when he used a rosin-glycerol ester having a melting point of 210° F., in accordance with *example 1 of appellant's application,* the product withstood the sintering test well; that he was of opinion that in order to make a pigment-resin dispersion powder for use as a shading color, it was necessary to use resins with a melting point of at least 200° F.; and that such powder should be of such size as would pass through a 20-mesh screen.

It appears that during the prosecution of appellant's application in the Patent Office, counsel for appellant introduced in evidence a portion of an article entitled "Physical and Chemical Examination of Paints, Varnishes, Lacquers and Colors," by Henry A. Gardner. The article is dated May 1939. It contains a list of synthetic resins and shows the melting point and other attributes of such resins. Some of the resins listed are stated to be "viscous liquid." The melting points of the resins vary. Some are below 200° F. and others are above 200° F.

The patentee Verbyla states that he produces a substantially dry product which can be shipped or handled without the use of liquid-proof containers. Accordingly, it would seem to be obvious that his resinous material would not become liquid at ordinary temperatures, and, although nothing is said in the patent as to the melting point of the resin used, the patentee must have had in mind that it should have a sufficiently high melting point to prevent the product from sintering when subjected to high temperatures during handling, transportation, and storage.

It clearly appears from the affidavits of record that a resin having a low melting

point would be satisfactory where the temperature was sufficiently low, but that sintering would occur if the temperature was high unless a resin having a high melting point was used. One of the affidavits of record discloses that when a resin having a melting point below 200° F. was used and the resin coated pigments were stored in barrels for a week at a temperature of 110° F., which the affiant stated was not an unusual exposure during summer shipping conditions or in the winter in a warehouse near a source of heat, there was a marked sintering, and that when a resin having a melting point of not less than 200° F. was used there was less tendency to sintering.

It is obvious, therefore, that the resin selected should have a sufficiently high melting point so as to preclude sintering of the product, and that the selection of such a resin would depend upon the temperature to which the product would be likely to be subjected.

We are of opinion that the selection of a resin having the proper melting point would be obvious to one skilled in the art, and that the requirement in the appealed claims that the resin have a melting point of at least 200° F. is purely arbitrary and does not lend patentability to the claims.

Counsel for appellant relies here for patentability of the appealed claims on the size of appellant's resin coated pigment particles, the selection of a resinous material having a melting point of at least 200° F., and the use to which appellant's product is put.

We have given careful consideration to the arguments of counsel for appellant, but are of opinion that the reference patent discloses, or at least clearly suggests, the use of resin coated pigment particles of a size which would readily disperse in an organic coating composition; that the melting point of the coating resins should be sufficiently high to prevent sintering during transportation or storage; and that one skilled in the art, having knowledge of the patentee's disclosure, would have no difficulty in selecting the proper resin and determining what size particles would disperse readily and rapidly in paints or other compositions of the kind here involved.

In view of the facts and circumstances hereinbefore related, the new use to which appellant's composition is put does not involve invention. See In re Thuau, 135 F.

2d 344, 30 C.C.P.A., Patents, 979, and cases therein cited.

For the reasons stated, the decision of the Board of Appeals is affirmed.

Affirmed.